UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

VERINT SYSTEMS INC., and VERINT
AMERICAS INC.,

               Plaintiffs and Counter Defendants,

               -v-

RED BOX RECORDERS LTD.,

               Defendant and Counter Claimant.

------------------------------------------------------------- X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>December 7, 2016</u> |

14-cv-5403 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

      Virtually every invention could be described at a high level in a few words:
"A method to provide answers to questions" for a search engine; "a tool to assist a
user to draft documents" for a document-processing program; "a tool to remove a
cork from a container" for a battery-operated wine-bottle opener; "a beverage
container that does not leak when tipped" for a thermos with a particularly nifty lid.
One need only look around a room to think of many more.

      Similarly, virtually any invention could be described as simply addressing
that which others long ago addressed: the Socratic method to acquire information;
quills, pens, typewriters, to create written text; corkscrews to open wine bottles; and
clay jugs with covers to prevent spills.  This reductionist simplicity may obscure
underlying complexity, and it may jeopardize the innovative improvements upon
longstanding accomplishments that patents are intended to incent.  Patent law

protects the builder of a better mousetrap, even if his or her invention could be described as, simply, a mousetrap—or as a "method to catch a mouse."

Many recent motions seeking determinations of patent ineligibility suffer from such reductionist simplicity—from characterizing as simply a mousetrap that which is in fact a better mousetrap.  Courts faced with such motions must scrutinize reductive descriptions with great care.  It has also become increasingly common for litigants to pursue such judicial rulings, which can be as complex as Markman rulings but without a similar record.  Courts must therefore be alert to motions seeking factual determinations of what a claimed invention "is" when unaccompanied by the necessary submissions from those skilled in the art.

In short, the current fad of ineligibility motions in patent cases has, in certain respects, gotten ahead of itself.  There are instances in which a patent—or a single claim—may truly be ineligible under 35 U.S.C. § 101.  But courts should make such determinations on a proper record and should not confuse such determinations with the inquiries properly made under §§ 102 or 103—the sections of the patent law governing novelty and obviousness.

Before this Court is a motion by the defendant to invalidate all claims in six separate patents: U.S. Patent Nos. 7,774,854 ("the '854 patent); 5,790,798 ("the '798 patent"); 6,510,220 ("the '220 patent"); RE43,324 ("the '324 patent"); RE43,386 ("the '386 patent"); and 8,189,763 ("the '763 patent").  Defendant Red Box Recorders Ltd. ("Red Box") presents its argument with the same reductionist simplicity common now in § 101 motions: It argues that all of the inventions claimed can be distilled to

a single phrase: "the abstract idea of processing (<u>i.e.</u>, recording, monitoring,

analyzing, and/or securing) data and information in telecommunications." (Mem. in

Supp. at 1., ECF No. 145 at 5.)   Red Box further argues that the inventions do

nothing new: "The claimed methods do no more than require a call-center agent to

engage in 'well-understood, routine, conventional activity previously known to the

industry.'"  (<u>Id.</u>) (citing <u>Alice Corp. Pty. v. CLS Bank Int'l</u>, 134 S. Ct. 2347, 2359

(2014)).  There is, however, significant complexity in the patents obscured by this

reductionist simplicity.  Whether that complexity is novel or obvious is not at issue

on this motion.  Rather, the two questions properly addressed here are: (1) whether

the patents simply claim an abstract concept (they do not); and (2) whether, even if

they do, they are sufficiently inventive to be patentable nonetheless (most are).

Accordingly, defendant's motion is DENIED.

Below, the Court first sets forth the legal standard for patent eligibility.

Next, the Court addresses each of the patents at issue on this motion.  Specifically,

the Court addresses only those claims the parties have proffered as representative

in their respective memorandums.

I.     PATENT ELIGIBILITY UNDER 35 U.S.C. § 101[1]

"Section 101 of the Patent Act defines the subject matter eligible for patent

protection." <u>Alice</u>, 134 S. Ct. at 2354.  It provides:

> Whoever invents or discovers any new and useful process,
> machine, manufacture, or composition of matter, or any

---

[1] This motion is brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Court
applies that familiar standard here.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

3

new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of
this title.

35 U.S.C. § 101.  "The Supreme Court has 'interpreted § 101 and its predecessors . .

. for more than 150 years' to 'contain[] an important implicit exception: Laws of

nature, natural phenomena, and abstract ideas are not patentable.'" Rapid Litig.

Mgmt. Ltd. v. CellzDirect, Inc., 827 F.3d 1042, 1047 (Fed. Cir. 2016) (quoting Alice,

134 S. Ct. at 2354).  Monopolization of these "basic tools of scientific and

technological work . . . might tend to impede innovation more than it would tend to

promote it,' thereby thwarting the primary object of the patent laws." Alice, 134 S.

Ct. at 2354 (quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc. ("Mayo"),

132 S. Ct. 1289, 1293 (2012)) (alterations omitted); see also Synopsys, Inc. v. Mentor

Graphics Corp., 839 F.3d 1138, 1146-47 (Fed. Cir. 2016) ("[W]e continue to 'treat[]

analyzing information by steps people go through in their minds, or by

mathematical algorithms, without more, as essentially mental processes within the

abstract-idea category.'") (quoting Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d

1350, 1354 (Fed. Cir. 2016)).  However, these exceptions to patent eligibility must

not be applied beyond the limits of the exception's purpose of preventing the

preemption of new discoveries.  Otherwise, "this exclusionary principle [could]

swallow all of patent law." Alice, 134 S. Ct. at 2354.  Nor is the § 101 inquiry a

replacement for, or coterminous with, investigation of novelty or obviousness under

§§ 102 and 103.

4

"The issue of patent-eligibility under § 101 is a question of law[.]" CellzDirect, 827 F.3d at 1047.  At least one the Federal Circuit judge has expressed the view that "no presumption of eligibility attends the section 101 inquiry." Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 717, 720-21 (Fed. Cir. 2014) (Mayer, J., concurring).  To determine whether claims contain ineligible patent subject matter under § 101, the Court must apply the two-step test introduced in Mayo, 132 S. Ct. 1289, and further explained in Alice, 134 S. Ct. 2347.

           1.     Alice Step One

At Alice step one, a court must determine whether the claimed invention is "directed to" ineligible subject matter, including "abstract ideas."  Alice, 134 S. Ct. at 2355.  This step requires a court to consider the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1346 (Fed. Cir. 2015).  However, the Supreme Court "has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the Mayo/Alice inquiry."  Enfish, 822 F.3d at 1334.  Rather, the Supreme Court and the Federal Circuit "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."  Id.

In the two years since Alice, the Federal Circuit has frequently held ineligible patents that involve "fundamental economic and conventional business practices," the addition of "conventional computer components to well-known business practices," or the "use of an abstract mathematical formula on any general purpose

computer;" or that recite "a purely conventional computer implementation of a

mathematical formula" or "generalized steps to be performed on a computer using

conventional computer activity."  Enfish, 822 F.3d at 1335, 1338.  See also

Tranxition, Inc. v. Lenovo (United States) Inc., ___ F. App'x ___, 2016 WL 6775967

at *3 (Fed. Cir. 2016) ("It is necessarily true that a human might apply an abstract

idea in a different manner from a computer.  What matters is the application.

'Stating an abstract idea while adding the words 'apply it with a computer' will not

render an abstract idea non-abstract.'  There must be more.") (quoting Alice, 134 S.

Ct. at 2359) (internal citation omitted).  The Federal Circuit has generally found

claims ineligible when they merely required generic computer implementation at a

high level of generality and failed to effect an improvement in any technology or

technical field.  See, e.g., Affinity Labs of Tex., LLC v. Amazon.com Inc., 838 F.3d

1266, 1270 (Fed. Cir. 2016); Fairwarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089,

1094 (Fed. Cir. 2016); Versata Dev. Grp., Inc. v. SAP Am., Inc., 793 F.3d 1306, 1333

(Fed. Cir. 2015); Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d

1363, 1367-68 (Fed. Cir. 2015); Internet Patents, 790 F.3d at 1348; OIP Techs., Inc.

v. Amazon.com, Inc., 788 F.3d 1359, 1362-63 (Fed. Cir. 2015); Content Extraction &

Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1347 (Fed. Cir.

2015); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1354-55 (Fed. Cir. 2014);

Planet Bingo, LLC v. VKGS LLC, 576 F. App'x 1005, 1008 (Fed. Cir. 2014); Digitech

Image Techs., LLC v. Elecs. for Imaging, Inc., 758 F.3d 1344, 1351 (Fed. Cir. 2014).

However, the Federal Circuit has begun to clarify the outer bounds of the Alice doctrine of ineligibility.  Applying Alice step one, the court in Enfish concluded that the claims were patent eligible under § 101 and stated that it "d[id] not read Alice to broadly hold that all improvements in computer-related technology are inherently abstract" such that a court must immediately move to step two.  Enfish, 822 F.3d at 1335.  The core question underlying step one is "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."  Id. at 1335-36.  The "directed to" inquiry at Alice step one "cannot simply ask whether the claims involve a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon[.]"  Id. at 1335 (emphasis in original); see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc., ___ F.3d ___, 2016 WL 6440387 at *9 (Fed. Cir. Nov. 1, 2016) ("We recognize . . . that at some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.") (internal quotation marks omitted) (emphasis in original).  Instead, at step one, patent claims must be "considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'"  Enfish, 822 F.3d at 1335 (quoting Internet Patents, 790 F.3d at 1346).  Therefore, courts look both to the language of the claim as well as the language of the specification.  See Amdocs, ___ F.3d ___, 2016 WL 6440387 at *9 ("In addition to taking into consideration the approved claim constructions, we

examine the claims in light of the written description."); <u>In re TLI Commc'ns LLC Patent Litig.</u>, 823 F.3d 607, 611-15 (Fed. Cir. 2016) (examining patent claims under <u>Alice</u> steps one and two in light of the written description).

In light of <u>Enfish</u> and other post-<u>Alice</u> decisions, "it is clear that the main thrust behind step one is to determine whether the claim moves beyond a long-understood concept or simply seeks to monopolize one by masking it through the medium of technology.  To resolve this question, a court must define the idea, and then ask whether that idea, in all of its generic permutations, essentially constitutes the invention, or whether the invention is to accomplish the abstract idea in a particular way." <u>Iron Gate Sec. v. Lowe's Co.</u>, 2016 WL 4146140, at *8 (S.D.N.Y. Aug. 3, 2016).

### 2.   <u>Alice Step Two</u>

The fact that a claim is directed to a patent-ineligible concept does not necessarily mean it is patent ineligible under § 101.  <u>Alice</u>, 134 S. Ct. at 2354 ("[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept.").  <u>Alice</u> requires a court to "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application."  <u>Id.</u> at 2357 (internal quotation marks omitted).  The Court must look to the remaining elements aside from those directed to an abstract idea, either in isolation or combination with the other non-patent-ineligible elements.  <u>E.g.</u>, <u>Versata</u>, 793 F.3d at 1334; <u>In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.</u>, 774 F.3d 755, 764 (Fed. Cir.

2014); see also Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations."); I/P Engine, Inc. v. AOL Inc., 576 F. App'x 982, 993 (Fed. Cir. 2014) (Mayer, J., concurring).  "Step two is 'a search for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" Intellectual Ventures I LLC v. Symantec Corp., ___ F.3d ___, 2016 WL 5539870 at *3 (Fed. Cir. Sept. 30, 2016) (quoting Alice, 134 S. Ct. at 2355).

The scope of inquiry appropriate for Alice step two is limited to eligibility only.  The Court must not to delve into whether the patents-in-suit are invalid under §§ 102 or 103 for lack of novelty or non-obviousness—Alice did not strike down the statutory distinctions between eligibility under § 101 and invalidity under §§ 102 and 103.  See Parker v. Flook, 437 U.S. 584, 588 (1978) ("This case turns entirely on the proper construction of § 101 of the Patent Act, which describes the subject matter that is eligible for patent protection.  It does not involve the familiar issues of novelty and obviousness that routinely arise under §§ 102 and 103 when the validity of a patent is challenged.") (footnote omitted); Intellectual Ventures I, 2016 WL 5539870 at *4 ("Indeed, [t]he novelty of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter.") (internal quotation marks omitted); CLS Bank Int'l v. Alice Corp. Pty.

Ltd., 717 F.3d 1269, 1284 (Fed. Cir. 2013) ("We do not therefore understand that language to be confused with novelty or nonobviousness analyses, which consider whether particular steps or physical components together constitute a new or nonobvious invention.  Analyzing patent eligibility, in contrast, considers whether steps combined with a natural law or abstract idea are so insignificant, conventional, or routine as to yield a claim that effectively covers the natural law or abstract idea itself."); Chamberlain Grp., Inc. v. Linear LLC, 114 F. Supp. 3d 614, 627 (N.D. Ill. 2015) ("Defendant's argument, however, treads too closely to allegations of novelty and obviousness. . . . [T]hat analysis is more appropriately addressed as a question of what constitutes the prior art and whether the [patent] claims hold any novelty[.]"); see also 35 U.S.C. §§ 102, 103.

The proper question is therefore not whether the invention is novel or whether it would be obvious to someone skilled in the art, but whether the claims contain an inventive concept such that the invention does not claim an abstract idea.  Reciting "only routine and conventional steps" is insufficient to state an inventive concept, BRCA, 774 F.3d at 765; see also In re Smith, 815 F.3d 816, 819 (Fed. Cir. 2016) ("[A]ppending purely conventional steps to an abstract idea does not supply a sufficiently inventive concept."); as is simply adding a computer to an abstract idea, DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("[R]ecitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible.").  However, claims that "'purport[] to improve the functioning of the computer itself' or 'effect an improvement in any other technology

or technical field'" suffice under step two.  <u>Mortgage Grader</u>, 811 F.3d at 1325

(quoting <u>Alice</u>, 134 S. Ct. at 2359); <u>see also</u> <u>Amdocs</u>, ___ F.3d ___, 2016 WL 6440387

at *10 (explaining that a "solution [that] requires arguably generic components" is

still patent eligible when "these generic components operate in a nonconventional

manner to achieve and improvement in computer functionality" that is "a critical

advancement over the prior art").  An inventive concept may also be present where

the claim involves "the non-conventional and non-generic arrangement of known,

conventional places."  <u>Bascom Global</u>, 2016 WL 3514158, at *6.

The Court has developed the following list of non-exhaustive questions

relevant to the step-two analysis:

> (1) Is there an improvement recited?
>
> (2) Is there a benefit recited?
>
> (3) Is something new recited?
>
> (4) Does the patent have one or more particular applications?
>
> (5) What are the steps and limits to be followed in applying the invention?

<u>Iron Gate Sec.</u>, 2016 WL 4146140 at *10.  These questions cut to the nub of the

issue: whether the claimed invention merely attempts to monopolize ineligible

subject matter in a particular setting, or whether it actually works an improvement

in human knowledge.  Only the latter may receive patent protection.

11

## II.   THE PATENTS AT ISSUE

Plaintiffs assert infringement claims with regard to six patents.  While defendant's motion seeks a judicial determination of ineligibility as to all claims, it focuses on a single representative claim in each patent.  With one exception (relating to the '854 Patent), plaintiffs do not take issue with the claims selected as representative.  (This Court discusses both claims proffered as representative in connection with the '854 Patent).

### A.   The '854 Patent

The '854 Patent, issued in 2010, addresses a narrow issue that may arise in the context of a recorded telephone or computer communication containing information a party wishes to protect from further dissemination.  In lay terms, the patent discloses a method that is directed at recording the communication, electronically identifying information to be protected, and rendering it unintelligible to anyone without authorization to access that information.

The specification provides important background for understanding the claims.  See Amdocs, ___ F.3d ___, 2016 WL 6440387 at *9; Enfish, 822 F.3d at 1335.  It describes the method disclosed in the patent as addressing an ongoing issue in recorded telecommunications that capture private information.  ('854 Patent 1:24-27.)  The telecommunication may occur over the telephone or via computer.  (Id. at 1:28-29.)  In either event, private, sensitive information may be exchanged.  The invention seeks to allow preservation of the communication while limiting access to the private, sensitive information received.  (Id. at 1:58-67.)  The specification

12

describes embodiments of the method that may be accomplished by automated identification of the sensitive information and automated selective termination of the communication only during those times when such sensitive information is being communicated, (id. at 2:43-45), or recording such information but creating an automated process to allow only selected, authorized access to such information, (id. at 2:45-49). In that regard, the automated process might obfuscate, mask, or encrypt a portion of the information. (Id. at 2:52-53.)

To accomplish the method, the specification describes a monitoring system that receives information from a communications network and uses a set of rules that can be stored in a database and that control the start/stop/break functions of the recording device. ('854 Patent 3:13-23.) The portion of the communication comprising the sensitive information may or may not be recorded; if it is recorded, then methods are described to ensure that the information is protected from unauthorized access. (Id. at 3:47-58.) The protections described are implemented according to various "triggers;" the figures included in the patent describe some of them. (Id. at 4:24-37.) The triggers might be initiated based on desktop events (that is, the entry of sensitive information into certain portions of a screen), or based on a voice-recognition filter. (Id. at 4:63-5:7.) Identified sensitive information may either be deleted or retained; if retained, it could be modified essentially contemporaneously to prevent unauthorized access. (Id. at 5:62-67.) The method allows for remote monitoring of the communication with real-time protections imposed. (Id. at 6:36-44.) For instance, a supervisor in a call center could monitor a

13

communication but receive access to the sensitive information conveyed by the customer either telephonically or over the computer.  The specification includes diagrams and flow charts illustrating the method.  (<u>Id.</u> figs. 1-4.)

With the above as background, the Court turns to the specific language of claims 1 and 25.

Claim 1 states:

> A method of protecting information provided to an agent via a communication network comprising:
>
> receiving, at a communication monitoring server, an interactive communication responsive to an agent request via a communication network, the communication including information that is to be protected;
>
> routing the communication to an agent;
>
> recording at least a portion of the communication;
>
> electronically identifying the information that is to be protected from the communication; and
>
> preventing unauthorized access to the information that is to be protected during replay of the portion of the communication.

('854 Patent 9:25-38.)  Claim 25 states:

> A computer-readable medium having a computer program stored thereon, the computer program comprising computer-executable instructions for performing a computer-executed method for protecting information provided to an agent via a communication network, said method comprising:
>
> receiving an interactive communication responsive to an agent request via a communication network, the

14

> communication including information that is to be
> protected;
>
> electronically identifying the information that is to be
> protected from the communication;
>
> recording at least a portion of the communication; and
>
> preventing unauthorized access to the information such
> that, if it is determined that the information that is to be
> protected has been recorded, at least a portion of the
> information is rendered unintelligible to a user unless
> that user possesses an authorization to access the
> information.

(Id. at 12:19-36.)

Both claims recite concrete steps necessary to accomplish the invention claimed. Claim 1 may initially appear to be a relatively simple method—but it must be read in light of its limitations and against the parameters outlined in the specification. See Amdocs, ___ F.3d ___, 2016 WL 6440387 at *9; Enfish, 822 F.3d at 1335. A key step of claim 1 includes recording at least a portion of an overall communication that includes sensitive information for which protection is sought; one learns from the specification that such recording need not include, and in certain embodiments may in real time exclude, the capture of the sensitive information. An additional step is the automated—or "electronic"—identification of the sensitive information, and then its protection and the prevention of unauthorized access.

Claim 25 discloses an invention related to, but different from, that in claim 1. It is more complex than claim 1 and contains a number of additional, concrete limitations. For instance, the method in claim 25 is limited to a computer program

that executes the disclosed method automatically.  To do so, it identifies the sensitive information by way of a computerized, automated process, before the recording step; and it prevents unauthorized access to recorded information by rendering a portion of the information unintelligible.

The first step of the <u>Alice</u> test requires us to ask whether either claim 1 or claim 25 is simply directed to an abstract concept.  They are not.

Defendant argues that claim 1 is no more than a method for protecting sensitive information.  This argument is akin to that described at the opening of this decision: a reductionist articulation of the invention at issue. Defendant's articulation of the invention fails to do justice to the claims.

It is more accurate to describe these claims as a method to contemporaneously and automatically record, screen, and protect sensitive information exchanged over an electronic network.  Access to such information may either be permitted for those with authorization, or there may be a deletion of the information that occurs in real time, thereby preventing access.  This not an abstract concept.

Though the Court need not proceed to step two of the <u>Alice</u> analysis for claims 1 and 25, they would survive step two even if the claimed methods were properly considered directed to an abstract idea.  Step two asks whether "additional elements of each claim both individually and as an ordered combination . . . transform the nature of the claim into a patent-eligible application" of an abstract idea.  <u>Alice</u>, 134 S. Ct. at 2355 (internal quotation marks omitted).  The Court

16

approaches this question with caution as it risks treading into the inquiries properly considered in §§ 102 and 103 of the Patent Act, but acknowledges that these questions must be asked if the invention fails the first step of <u>Alice</u>.  The difference between what the second step of <u>Alice</u> examines, and that which a court would examine in analyses under §§ 102 and/or 103, is that step two of <u>Alice</u> is limited to claimed benefits and improvements, versus true novelty or obviousness as measured against prior art.  These inquiries are no doubt closely related.  Certainly, if an invention passes a §§ 102 or 103 analysis, it should pass <u>Alice</u> step two.  But it may be the case that—as here—there is an insufficient record to analyze inventiveness against the standards in those provisions, and the Court instead must rely on what is claimed in the specification itself.  <u>See</u> <u>Enfish</u>, 822 F.3d at 1335 (quoting <u>Internet Patents</u>, 790 F.3d at 1346).[2]

Here, the specification describes advantages over existing methods. Defendant has not presented any facts suggesting those descriptions are factually incorrect.  For instance, the specification claims that the method disclosed improves protection of sensitive information because it addresses both telephone and computer communications; because its claimed improvements further include automated, trigger identification of sensitive information; and because the improvements include the ability to automatically, and contemporaneously, start and stop a recording or to delete or obscure the sensitive information, immediately

---

[2] The only factual record proffered on this motion is by way of the declaration of Benedict Occhiogrosso.  (Occhiogrosso Dec.; ECF No. 151-1.)  Plaintiffs submitted his declaration in support of the '854, '324, '386, '798, and '220 Patents.  Defendant has not rebutted this declaration.

rendering it unavailable without authorization. ('854 Patent at 1:28-40.) There is no factual basis for the Court to disregard these claimed advantages. In addition to finding support in the specification, plaintiff has submitted a supportive declaration from Benedict Occhiogrosso, proffered as a telecommunications and information technology expert, who states that before the '854 Patent, "no one had previously identified the need for and/or developed methods to protect sensitive verbal information that was spoken and being recorded. Prior to the 854 [Patent], if a recording was made of a conversation it was stored in its entirety with both the sensitive and nonsensitive information intact and capable of being played back to supervisory personnel." (Occhiogrosso Dec. ¶ 13; ECF No. 151-1 at 6.) This confirms that even if the '854 Patent were directed to an abstract concept, its improvements over prior art render it patent eligible.

   B. The '324 and '386 Patents

   Both parties discuss the '324 and '386 patents together. This Court will therefore do the same. Both patents originally issued prior to the '854 by almost nine years; they were both reissued in the spring of 2012.

   The patents relate to issues confronted in call centers handling "voice over internet protocol" ("VOIP") communications as opposed to standard, analog calls. An essential difference in the technology delivering these two types of calls is that a VOIP call arrives in data packets that contain a variety of information. These packets may arrive out of order and in bursts, unlike more continuous analog signals.

The '324 Patent discloses a method to "capture" (and thereby record) these VOIP calls, to identify the information included in the data packets, and to record that data in a particular manner.  The first heading in the specification for this patent identifies the invention as a "VOIP VOICE INTERACTION MONITOR". ('324 Patent 1:1.)  The specification describes the invention as providing a "telecommunications monitoring apparatus having advantages over known apparatus."  (Id. 2:7-9.)  The method provides means to monitor VOIP signals, analyze their content, and to record portions identified according to predefined parameters.  (Id. 2:10-22.)  An advantage of the invention is described as allowing for the real-time, preferably instantaneous identification and recording of a specified parameter, enabling monitoring of that parameter.  (Id. at 2:37-41.)  The monitoring method also may be arranged in a manner that has little to no effect on the actual network.  (Id. at 2:63-67.)

The specification describes a non-exhaustive list of parameters that can be used to identify and analyze the information in the data packets specific to the content of the call: non-voice elements (such as computer-synthesized speech), the relationship between certain transmissions, the amplitude envelope of the signals, the frequency spectrum, advanced parameters characterizing the actual speaker, the language of the speaker, the gender of the speaker, and the use of certain phrases. ('324 Patent 3:28-62.)  There are also parameters that can be analyzed having nothing to do with the content of the call itself, including the date, time, and direction of the call.  (Id. at 3:63-65.)  Figures 3 and 4, added as part of the reissued

patent, further explain the method. (Id. at figs. 3, 4.) Figure 3 presents a flowchart

of an exemplar process for monitoring communication traffic, and Figure 4 contains

a list of exemplar parameters. (See id. at 7:22-60.)

The specific language of claim 18 the '324 Patent sets forth a number of

concrete limitations included within this claimed method.

Claim 18 states:

> A method for capturing a telephone interaction,
> comprising:
>
> receiving audio data packets at a switch that are
> transmitted over a first network, wherein the audio data
> packets include packet headers and packet bodies;
>
> identifying data within the audio data packets at a data
> analysis engine that is communicatively connected to the
> switch by a second network, the identifying being based
> on at least one predetermined parameter associated with
> a payload of the audio data packets; and
>
> recording for analysis, at a recorder, any of the received
> audio data packets that include the at least one
> predetermined parameter, wherein the recorder is
> communicatively connected to the data analysis engine by
> the second network.

('324 Patent 11:17-31.) Thus, as a first step, claim 18 requires receipt of data

packets that include both headers and bodies; such receipt occurs at a "switch." The

second step requires identification of at least one predetermined parameter of the

data in a particular place (a data analysis engine) which must, in turn, be

"communicatively connected" to the switch by a second network. The third step

contains additional limitations: recording for the purpose of analysis, and the recorder must be "communicatively connected" to the "data analysis engine."

Applying the Alice framework, the language of claim 18, read against the specification, makes clear that it is not directed to an abstract concept under step one.  Inventing a method for monitoring VOIP interactions requires more than "monitoring a communication"—in other words, it requires more than simply listening to a telephone call.  But even if this Court considered the claim abstract, it nonetheless survives Alice step two.  As described above, the specification outlines advantages (or inventiveness) over prior art (for instance, the instantaneous identification of a parameter to be monitored and an ability to hone in on that at the correct time/place).  (See also Occhiogrosso Dec. ¶ 15 ("The 324/386 Patents recognized that an IP Recording System will capture voice transmission with direct integration with specific VoIP switches and IP networks more efficiently [b]y directly recording calls from an IP network using (either Passive or active) VoIP recording methods.").)  The Court has no basis in the record before it to second guess the claimed advantages of claim 18.

Claim 27 of the '386 Patent contains an initial heading describing it as a "COMMUNICATION MANAGEMENT SYSTEM FOR NETWORK-BASED TELEPHONES."  ('386 Patent at 1:1-2.)  The '386 Patent shares a specification with the '324 Patent (it does, however, contain an additional figure).  In contrast with claim 18 of the '324 Patent—which is concerned with identifying and recording data

packets in a VOIP communication—claim 27 of the '386 is concerned with a method
for storing data packets.

Claim 27 states:

> A method for storing at least a portion of an interaction
> occurring over a network between a packet source and a
> packet destination, the method comprising the steps of:
>
> receiving data packets from the network at a switch, the
> data packets containing at least the portion of the
> interaction comprising one or more of audio data or video
> data;
>
> communicating the data packets to a data analysis
> engine;
>
> identifying, at the data analysis engine, an interaction to
> which the data packets belong responsive to information
> included within the data packets; and
>
> storing at least a portion of the interaction contained
> within the data packets in a storage device.

('386 Patent 12:24-37.)  As with claim 18 of the '324 Patent, this claim contains
multiple steps, each with specific limitations.  First, the storage method relates to
interactions between a packet source and a packet destination.  The data is
received, communicated to a particular location, and identified, and at least a
portion is then stored.  These steps are concededly rather basic, but this Court
cannot determine that they are "abstract" as described in step one of <u>Alice</u>.  While
storage of a communication has been around since correspondence was first placed
in desk drawers, there are aspects of the claim that remove it from such a high-level
description.  In particular, the method involves a communication of data packets

which, prior to storage, are examined in a specific manner for purposes of identifying and storing at least a portion.

As this claim passes Alice at step one, the Court need not address step two. Regarding this particular claim of the '386 Patent, the Court notes that step two might present more difficulty than step one.[3]  Furthermore, it is not apparent that this claim would pass the novelty and obviousness inquiries more properly untaken in connection with §§ 102 and 103 of the Patent Act—but such an analysis would also require a more developed factual record.  Thus, while claim 27 of the '386 Patent passes step one of the Alice inquiry, whether it survives further analysis is a non-frivolous issue for another day.

C.  The '798 and '220 Patents

The '798 and '220 Patents share a specification.  The '798 Patent was issued in 1998, while the '220 Patent issued in 2003.  Both patents concern enabling synchronized monitoring of call-center customer interactions that can occur both over a telephone and computer.  It is important to any understanding of the '798 Patent that its 1998 issuance date be kept in mind.  In 1998, synchronizing the remote monitoring of two separate digital mediums of communication, in one place and at the same time, was an emerging issue.  (See Occhiogrosso Dec. ¶ 14 ("Simultaneous recording and synchronized playback of voice and screen data,

---

[3] The Court notes that the Occhiogrosso declaration discusses the inventiveness of the '324 and '386 patents in the same breath, but the improvements cited appear, on this record, to be grounded more in the identification and recording method of the '324 Patent than the storage method of the '386 Patent.

which is integral to [the '798 and '220 Patents], was not offered in any system I was aware of at the time [of the patent application in 1996]."))

The Abstract describes the invention as useful for "providing training and assistance to those using []workstations," but also "providing an audit trail of significant on screen events." ('798 Patent at [57]).) The Abstract further describes certain embodiments as including one in which "graphics primitives are used to determine localized screen changes which are periodically copied from the monitored workstation and sent over a network to a remote, monitoring, workstation." (Id.)  Figure 2 illustrates how the "graphics primitives" are used in an embodiment.  ('798 Patent fig. 2.)

The specification describes asserted benefits of the invention over prior art. It states that "[t]he present invention overcomes deficiencies in the prior art by providing an improved method and apparatus" to enable passive monitoring that does not interfere with the monitored-employee's workstation; that allows for both on-screen and telephonic monitoring; that provides for later play-back in a synchronized manner; and that enables an audit trail.  (See, e.g., '798 Patent 2:23-33.)  The specification further defines steps of "intercepting and interpreting at least one graphic primitive function call made to the display driver to define a localized changed screen region sized less than the display screen."  (Id. at 2:34-42.)  Put differently, the invention enables interception of a change in screen that is less than a change in the entire screen; for instance, if a field is filled in within a portion of a screen, that fill would constitute a change in less than the entire screen.  The

24

changed region is then copied and transported to a remote location for review on the screen of a monitoring workstation.  (Id. at 2:42-48.)

The invention also provides a method to compare two sequential display screens and determine the differences, copy a changed region, and transport that copy to a remote location for review on the screen of a monitoring workstation.  (Id. at 2:49-62.)

Under the first and preferred embodiment of the invention:

> [S]oftware on the server is configured to send data polls to software installed and running on the agent's workstation.  The software on the agent's workstation intercepts or "hooks" operating system graphics primitives relevant to actual screen display, and returns only selected screen portions (referred to as "Changed Regions") which have changed since the last data poll. These Changed Regions are then displayable at a remote location either in real time or at a later time.  The technique is substantially "passive" . . . .

(Id. at 4:52-64.)  Portions of the specification describe details of the "Monitored Workstation," the "Agent's Software Setup," and the "Changed Region."  (Id. at 5:7-6:7; 6:9-6:32; 6:33-7:33.)  In addition, the "Capture Module" and "Monitor Modules" are described in some detail, as are "Hooking Graphics and their Interpretation." (Id. at 7:34-9:53; 9:54-10:11; 10:12-13:12.)

Defendant does not focus on particular claims of the '798 or '220 Patents. Plaintiff has presented claim 2 as representative for both.

Claim 2 of the '798 Patent, with additional language from the '220 Patent in brackets, states:

A method of monitoring, on a monitoring workstation, sequential on-screen activities of a monitored computer workstation having a display screen[, its own operating system,] and a telephone extension, said method comprising:

[A] determining sequential localized changed screen regions which correspond to at least two sequential screen changes[, by use of said monitored computer workstation];

[B] recording a telephone conversation occurring [before said screen changes,] during said screen changes; and

[C] playing back said telephone conversation recording in substantial synchronization with said [at least two] sequential screen changes substantially as they both happened in real time, to allow one at said monitoring [computer] workstation to simultaneously view on-screen activities and listen to telephone conversations substantially as they occurred at said monitored [computer] workstation.

Defendant argues that the above claim is nothing more than the abstract concept of monitoring an employee workstation. Not so. To reiterate a basic point made above, Claim 2 must be read against its specification. Amdocs, ___ F.3d ___, 2016 WL 6440387 at *9; Enfish, 822 F.3d at 1335. In that regard, it is far more than just a generic method of monitoring. It provides a method for complex monitoring of two different mediums of communication occurring in tandem (a display screen and telephone call), set out in a series of concrete and particularized steps that allow simultaneous monitoring and recording. The declaration of Occhiogrosso states that this invention addresses a real-world problem experienced at call centers at the time of the invention. (Occhiogrosso Dec. ¶ 14.) There is nothing abstract about the various aspects of the "Changed Region," "Capture," and "Monitoring" modules.

26

Defendants' reductionist language eliminates all of this.  Once it is considered, the possibility of a characterization as merely "workstation monitoring" disappears. The invention therefore passes step one of the <u>Alice</u> test.

But, in addition, the invention passes step two.  As discussed above, the specification recites benefits over the prior art, and, in his unrebutted declaration, Occhiogrosso agrees.  (<u>See</u> Occhiogrosso Dec. ¶ 14 ("This fundamental capability of recording both voice and screen data and play them back in synchrony . . . represented a dramatic improvement in the monitoring, training and quality assurance of the call center's agents[.]").)  This Court has no factual basis upon which to disagree with the statements made in the specification or the Occhiogrosso declaration.  Accordingly, the Court finds that claim 2 under both patents passes the second step of the <u>Alice</u> test.

### D. <u>The '763 Patent</u>

The final patent at issue on this motion is the '763 Patent.  Defendant again does not focus on a particular claim; plaintiff directs the Court to claim 16 as representative.  Plaintiff describes the invention as "addressing the difficulty call centers had in handling massive amounts of information to perform quality control and analysis of agent/sales representative performance."  (Mem. in Opp. at 9, ECF No. 151 at 13.)  The invention is a continuation in part of a patent application made in 2001.  At that time, available technology required manual review of calls to monitor for quality control, and a "human scoring."  ('763 Patent 2:26-30.)  The invention provides a method for a far more robust call analysis via the disclosed

27

graphical user interface ("GUI") pursuant to which real-time call progress can be analyzed.  (Id. at 4:33-67.)

In this regard, the specification identifies at least five separate issues that the patent seeks to address.  The first is the manual review and human scoring described above, (Id. at 2:26-38); the second relates to increased complexity of testing and analysis with increasingly complex call handling systems, (Id. at 2:44-57); the third relates to database records that do not adequately account for calls that "loop" through a portion of a script more than once, (Id. at 3:1-8); the fourth relates to the provision of more accurate information for purposes of a later follow-up call, (Id. at 3:21-30); and the fifth relates to enabling an ability to "jump" into a call at different points and identify or "hone in" on areas of interest, (Id. at 3:60-4:6).

The solution to these issues is described in claim 16.  That claim discloses:

> A method for analyzing communication streams, the method comprising:
>
> recording information associated with a communication;
>
> providing a graphical user interface configured to present an integrated view of a portion of the communication recorded by the recorder;
>
> constructing an integrated data stream comprising voice information and state information corresponding to events that occurred during the communication; and
>
> presenting, in the graphical user interface from the integrated data stream, an integrated view containing a first visualization of the portion of the communication and a second visualization of at least one event that occurred during the communication, the second visualization overlaying on the first visualization.

(Id. at 14:42-57.)  These steps should be read against the specification, which outlines concrete ways of accomplishing each of them.  (See id. at 2:25-4:29.)  Additionally, each step has its own limitations.  For instance, the GUI described in the second step is outlined in detail in the patent, and it is also defined in the claim as being configured in a particular manner to present an "integrated view" of a recorded communication.  (Id. at 14:52-57.)  In addition, the claim requires the construction of an "integrated" data stream—and such stream comprising both voice and screen (or state) information; a GUI then presents that information in particular manner—an integrated view requiring two different visualizations.  (Id.)

All of this leads to the conclusion that the GUI disclosed in this patent is far from abstract.  It is not simply directed to the analysis with a GUI; it is a highly technical way to capture, record, and present certain very specific information with specific limitations for specific purposes—the kind of "specific asserted improvement" that has repeatedly been found to be patent eligible.  See McRO, Inc. v. Bandai Namco Games Am., Inc., 837 F.3d 1299, 1314 (Fed. Cir. 2016).  It therefore passes the first step of the Alice test.

But in addition, it offers multiple improvements over prior art sufficient to meet the requirements of step two.  On its face, the patent describes a number of problems it addresses and how it improves on the technology available at the time of issue.  ('763 Patent 2:25-4:29).  There is no basis in the record on this motion for the Court to second guess any of those claimed advances.  To accept Red Box's level

of abstraction would not only obscure the complexity of this particular patent, it more broadly threaten the incentive to innovate upon past accomplishments that lies at the heart of patent law.  Accordingly, the '763 Patent also passes step two of <u>Alice</u> even if it were directed to an abstract idea.

III.    CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment on the basis of patent ineligibility is DENIED.

The Clerk of Court is directed to terminate the motion at ECF No. 144.

SO ORDERED.

Dated:      New York, New York
            December 7, 2016

_____
     KATHERINE B. FORREST
     United States District Judge

30